NOT DESIGNATED FOR PUBLICATION

No. 124,131

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of A.H. and C.P.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; MICHAEL J. HOELSCHER, judge. Opinion filed February 4, 2022. Affirmed.

*Jordan E. Kieffer*, of Jordan Kieffer, P.A., of Bel Aire, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., BRUNS and CLINE, JJ.

PER CURIAM:  Mother appeals the termination of her parental rights to her children A.H. and C.P. Mother does not challenge the district court's findings regarding her present unfitness, but rather challenges the district court's findings regarding her unfitness in the foreseeable future and the best interests of the children. Finding no error, we affirm.

*Factual and Procedural Background*

In May 2020, A.H., C.H., and C.P. were placed in police protective custody following multiple allegations concerning Mother's ability to care for the minor children. A few days later, the State filed a petition alleging the children were in need of care and the district court immediately placed the children in the protective custody of the Department for Children and Families (DCF). Mother and the three alleged fathers

1

waived their right to a temporary custody evidentiary hearing. Upon their waiver, the district court found there was probable cause to believe the children's health or welfare may be endangered without further care, and it was in their best interests to remain in out of home placement with DCF.

Mother and the father of A.H. entered a no contest stipulation at the adjudication hearing a few months later. The father of C.P. was found in default after failing to appear. Relying on the facts in the State's petition, the district court found that as to Mother and the fathers of A.H. and C.P., clear and convincing evidence showed: (1) the children were without adequate parental care, control or substance; (2) the children were without the care or control necessary for their physical, mental or emotional health; (3) the children had been physically, mentally, or emotionally abuse or neglected, or sexually abused; and (4) the children had been residing in the same residence with a sibling under 18 years of age who had been neglected or abused. The district court also adopted the proposed permanency plan and ordered visitation to be at the discretion of DCF or Saint Francis Ministries (SFM).

On February 9, 2021, the State moved to find the parents unfit and to terminate parental rights as to A.H and C.P. At the time of termination, these children were six years old and two years old, respectively. The State's motion alleged that Mother and the fathers of A.H. and C.P. were each unfit parents unable to care properly for the children based on six factors under K.S.A. 2020 Supp. 38-2269(b) and (c).

Two months later, the district court held a termination hearing considering the parental rights of Mother and C.P.'s father. At the start of the hearing, the district court found father in default for failing to appear and terminated his parental rights based on the State's proffered evidence and the district court's consideration of five factors under K.S.A. 2020 Supp. 38-2269(b) and (c).

After Mother testified on her own behalf, the State presented the testimony of Tayla Warren. Warren was the manager of the 316 Hotel, where the family had lived for a few months before the children were placed in protective custody. Warren testified to Mother's drug use, the family's eviction for nonpayment, and the care she provided for the children, primarily A.H., when Mother left the children unsupervised at the hotel.

Melissa Schmidt, A.H.'s therapist, also testified. She stated that she began providing services to A.H. in July 2020, but A.H. only recently began making progress in therapy. Apart from the initial meeting, Schmidt had not spoken with Mother. Schmidt, however, did not opine on the State's motion to terminate Mother's parental rights because she felt she did not have enough information.

Chyncia Howard, Mother's therapist, testified to her concern for Mother's substance abuse—indicating Mother had admitted to relapsing in the past but denied using methamphetamine when confronted with her most recent positive drug test results. Howard conceded Mother had made progress in her sobriety and she "recognizes that there was an issue" that caused the removal of the children from her care. Even so, she maintained her prognosis for Mother remained "guarded" because Mother "has to do the work." Howard stated Mother was doing the work but contended Mother is "only at the beginning stages."

The family's permanency specialist at SFM, Mallory Zimmerman, testified alongside her supervisor, Mattie-Kay Stewart. Zimmerman testified to her experience working with Mother and the children the prior year. First, she stated Mother did not complete the majority of the urine analysis or hair follicle testing that SFM had requested. Second, Zimmerman spoke to Mother's failure to complete case plan tasks, including Mother's inability to find stable income and housing. In addition to testimony regarding visitations and A.H.'s "parentified" behavior, Zimmerman testified at length about Mother's actions towards Zimmerman and other SFM staff. Zimmerman testified

3

that Mother claimed to hire private investigators to look into the case, Mother indicated she would kidnap the children, Mother believed people were following her after visitations, and Mother made threatening comments that made Zimmerman concerned for her own safety. Zimmerman testified that Mother should not be given more time to show progress because Zimmerman did not foresee Mother's issues of unstable income and housing changing in the near future.

Stewart underscored Zimmerman's concerns, and testified A.H. needed secure adults in her life due to the trauma she had experienced as a child. Stewart also testified to Mother's inability to show secondary change and opined that secondary change was important to show Mother was ready for reintegration. Mother's dishonesty with SFM throughout these proceedings further supported Stewart's opinion that Mother's unfitness was unlikely to change in the foreseeable future. Stewart concluded it would be in both children's best interests to terminate Mother's parental rights.

The district court took the matter under advisement after closing statements. Three days later, the district court announced its ruling from the bench. It found Mother "was not credible on the issue of her methamphetamines usage" because her testimony contradicted itself and conflicted with the testimony of the other witnesses. The district court also found Mother's testimony about the events that occurred at the 316 Hotel was not credible; rather, Warren was a "very credible witness" for those events. Generally, the district court made the following findings:

- Hair samples collected from C.P and C.H. tested positive for methamphetamine nearly two weeks after they were placed in police protective custody. Over the prior year, Mother had three hair follicles test positive for methamphetamines, and three urine samples tested positive for methamphetamine.
- Mother told Warren she was using methamphetamines while living at the 316 Hotel. A.H. sought assistance for Mother while at the hotel because Mother was

4

unresponsive. A.H. told Warren she was scared for Mother's safety on five or six occasions because Mother was "using needles." Warren witnessed needle caps in Mother's hotel room and witnessed needle tracks on Mother's arms.

- Mother's testimony regarding her methamphetamine use was inconsistent. She initially testified she relapsed a single time in June 2020, but she contradicted this testimony by stating she relapsed most recently in October 2020. This contradictory testimony, combined with the testimony of Howard, discredited Mother's testimony about her methamphetamine usage.

- Mother and her three children began living at the 316 Hotel around April 9, 2020, and they were removed by the Wichita police for non-payment on May 5, 2020. Four days later, Cecil, a hotel employee and friend of Mother, paid Mother's delinquent hotel bill and the family moved back into the 316 Hotel. Mother soon became delinquent again on her hotel bill.

- Warren testified the 316 Hotel is in a "very dangerous part of Wichita" and A.H. frequently wandered unsupervised to the hotel lobby, parking lot, and along the street. A.H. was frequently observed wandering the parking lot without shoes, and she was often seen wearing the same dress for multiple days.

- The staff at the 316 Hotel discovered the children unsupervised at the hotel on several occasions. On these occasions, hotel staff could not locate Mother for periods ranging from 15 minutes to several hours. The staff would feed the children at the nearby McDonald's. Warren and her husband provided food, clothing, and hygiene to the children. A.H. spent the night with Warren on some occasions when Mother could not be located.

- At the time of termination, Mother had been living in a rental in Wichita for five weeks. She used her pandemic stimulus money to pay the rent and deposit, but Mother's father leased the home because Mother did not have verifiable income. Mother will be responsible for the rent and utility bills after her father moves out, but she has depleted the stimulus funds. Prior to living in this rental, Mother lived in her father's camper, with friends, or in hotels. The district court found Mother

5

had lived in Hutchison, Towanda, Coffeyville, El Dorado, and Wichita during the pendency of this case.

- Mother was unemployed at the time of the evidentiary hearing and was last employed the two and a half years prior. Even so, Mother testified she was starting a new job the week after the termination hearing by providing private home healthcare.

- Mother conceded many of her domestic partners have been physically violent to her, have criminal records, and have been sex offenders. Mother conceded that C.P.'s father had a lengthy criminal record and physically abused her, but she continued to have contact with him and he was named as the father of Mother's twins that were due on October 5, 2021.

The district court relied on these factual findings to find Mother was unfit to care for the needs of A.H. and C.P. To reach its decision, the district court considered and applied these factors under K.S.A. 2020 Supp. 38-2269:

- The use of intoxicating liquors or narcotics or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the children under K.S.A. 2020 Supp. 38-2269(b)(3);

- The physical, mental, or emotional abuse or neglect or sexual abuse of the children under K.S.A. 2020 Supp. 38-2269(b)(4);

- The failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family under K.S.A. 2020 Supp. 38-2269(b)(7);

- The lack of effort on the part of Mother to adjust her circumstances, conduct or condition to meet the needs of the children under K.S.A. 2020 Supp. 38-2269(b)(8); and

6

- The failure to carry out a reasonable plan approved by the court directed toward the integration of the children into Mother's home under K.S.A. 2020 Supp. 38-2269(c)(3).

The district court then held that Mother's unfitness was unlikely to change in the foreseeable future and that termination of Mother's parental rights was in the best interests of the children.

Mother timely appeals.

*Analysis*

A parent has a constitutional protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (stating the interest of parents in the care, custody, and control of their children is a fundamental liberty interest); *In re B.D.-Y*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Accordingly, the State may terminate the legal bonds between parent and child only upon "clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a). If the district court makes such a finding, it must then consider whether termination is in the best interests of the child. The court's primary concern here is the physical, mental and emotional health of the child. K.S.A. 2020 Supp. 38-2269(g)(1).

Mother does not challenge the district court's finding that she is unfit under the five factors the district court considered. See K.S.A. 2020 Supp. 38-2269(b)(3), (b)(4), (b)(7), (b)(8), (c)(3). Rather, Mother challenges whether the State presented clear and convincing evidence that her unfitness was unlikely to change in the foreseeable future.

7

Mother also challenges the district court's finding regarding the best interests of the minor children.

*Mother's Unfitness is Unlikely to Change in the Foreseeable Future.*

We must first determine whether clear and convincing evidence supports the district court's decision regarding Mother's future unfitness. K.S.A. 2020 Supp. 38-2269(a). To do so, we must view the record in the light most favorable to the State—as the prevailing party below—to decide whether a rational fact-finder could have found it highly probable that Mother's unfitness is unlikely to change in the foreseeable future. In reviewing the record, we are not to reweigh the evidence, pass on the credibility of witnesses, or redetermine factual questions. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010).

Although there is no set amount of time that constitutes the "foreseeable future" in a parental termination proceeding, K.S.A. 2020 Supp. 38-2201(b)(4) acknowledges "that the time perception of a child differs from that of an adult and [the State should] dispose of all proceedings under the code without unnecessary delay." Accordingly, Kansas courts are to measure time in a termination case based on "'the child's perspective, not the parent['s], as time perception of a child differs from that of an adult.'" *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009) (finding a period of 11 months of incarceration not to be within the foreseeable future from a child's perspective). Kansas courts may reasonably look to the past conduct of a parent as being indicative of future behavior. *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018).

The State presented evidence to show Mother would need to provide a secure environment for the children by finding stable housing and income. In addition, she would be required to successfully complete a parenting plan and be introduced into the

children's life over a period of time. Further, she would need to find a way to avoid drugs and violence—which are serious concerns based on her prior history.

Mother primarily contends the evidence did not support the district court's foreseeable future finding because she had made some progress on most of her case plan tasks. But, as Stewart testified, Mother's completion of case plan tasks did not show Mother demonstrated "secondary change"—which Stewart testified was an important factor for reintegration and in the future:

> "Secondary change assures—not assures, but it gives us hope that there has been change and there is long-term change available for us to assess and look—and look at the evidence presented in front of us.
>
> . . . .
>
> "I do not believe that [Mother] has admitted an understanding of why her children are in DCF custody and her role in that. In working with Saint Francis, I do not believe that [Mother] has made appropriate steps towards secondary change."

Stewart added that she would not feel comfortable sending the children home with Mother for the foreseeable future because Mother had not demonstrated "her ability to make change and long systematic change."

The evidence also showed Mother continued to deny her issues with substance abuse, which her therapist, Howard, diagnosed as "severe." Hair samples collected from Mother, C.P. and C.H., tested posited for methamphetamines soon after the children were placed in police protective custody. In addition to Mother's positive hair follicle test in May 2020, evidence showed that Mother tested positive for methamphetamines and amphetamines—by either hair follicle or uranalysis test—on four occasions over the course of the proceedings.

9

Despite these tests, Mother repeatedly denied the results and provided inconsistent explanations. When confronted with the children's positive hair follicle results, Mother testified she had "no idea" why the children had methamphetamine in their system but agreed it was "concerning." When confronted with her own test results, Mother initially claimed she was clean until she had "one relapse" in June 2020. Yet she contradicted this testimony later by admitting to a relapse in October 2020. And this testimony was further contradicted by Howard's testimony, who stated Mother admitted to her that she last used methamphetamine in January 2021.

Although she admitted to two relapses on the stand, Mother consistently denied her positive hair follicle test from February 2021. She conceded the test result was positive, but maintained she was clean and had not been given a copy of the results upon her request. On another occasion, Mother opined that someone, B.P. or a friend, was putting liquified meth into the "vape juice" of her vape pen which may have caused her positive test result.

Additionally, the State presented evidence that Mother had completed only one of the three substance abuse treatment programs she had attended. She was unsuccessfully discharged from a treatment program during the pendency of this case due to her failure to attend. At termination, Mother testified she had been seeing Howard for substance abuse treatment since November 2020, but Howard clarified she did not begin treating Mother's substance abuse until March 2021. Howard opined that she likes to see people in substance abuse treatment for three months before the substance abuse program is complete and Mother can move on to aftercare. She testified that if Mother "continues to maintain her appointments, and I see her for three months, she can then enter into what we call aftercare, and aftercare would also include her therapy."

Although Mother provided three clean drug tests leading up to the termination hearing, Mother was not compliant with most of SFM's requests for drug testing until

10

March 2021. And both Zimmerman and Stewart testified Mother's termination testimony was the first time they have heard Mother admit to using methamphetamine.

Given the facts that led to the children's removal from her care, Mother's refusal to acknowledge her methamphetamine use is significant. The State presented evidence that prior to her removal, A.H. expressed concern to Warren on five or six occasions that Mother was "using needles." On one occasion, Warren called emergency services because A.H. believed Mother had overdosed from "using needles." When confronted with this evidence at trial, Mother conceded she used needles when using methamphetamine but denied using in front of A.H. Mother said she was cutting her son's hair with a friend when emergency services was called because A.H. believed Mother had overdosed.

As noted above, Howard testified that Mother was making progress in her sobriety but was "only at the beginning stages." Mother's early progress fails to show Mother's unfitness because of her methamphetamine use is likely to change in the foreseeable future. In fact, Mother's testimony was the only evidence presented that suggested Mother's unfitness based on her drug use would change in the foreseeable future. But, as noted, the district court found Mother's testimony regarding her methamphetamine use was not credible and we do not pass on credibility determinations on appeal. See *In re Adoption of Baby Girl P.*, 291 Kan. at 430-31.

Mother's lack of stable housing and employment are additional issues shown to be unlikely to change in the foreseeable future. Although Mother testified she was living in a three-bedroom rental home in Wichita at the time of termination, Zimmerman testified that Mother had reported living in "six or seven" difference residences the year before. And the longest period Mother had lived at any single residence was four months in Wichita, but Mother never provided proof of housing for that residence.

11

Mother had been living with her father in their Wichita rental home for five weeks at the time of termination, but Mother's own testimony showed she did not have stable housing during the pendency of this case. It is unclear how long Mother had lived in Hutchinson, but she moved there in August 2020 after the children had been removed from her care. At some point, Mother began living with friends and in hotels—moving back and forth from Coffeyville to Wichita—until December 2020 when she began living in El Dorado. Mother lived in El Dorado with her father for two weeks before moving into her father's camper in Wichita. She lived in her father's camper for two months until she moved into the Wichita rental.

Although Mother testified that she was on the lease, Zimmerman contradicted Mother's testimony by stating that the lease listed Mother solely as an occupant. Mother clarified that her father was on the lease because she did not have a verifiable income at the time of application. She also testified the landlord knew why her father applied and indicated that her name would be put on the lease once she had verifiable income. Mother then conceded she was solely an occupant on the lease but opined "it shows attempt" to find stable housing.

While Mother may have completed the case plan task of finding stable housing, the State's evidence showed that Mother's housing situation was not stable for the foreseeable future due to her lack of employment and diminished stimulus funds. Mother testified that she used her COVID-19 stimulus money to pay the rent, deposit, and utilities. But she also testified she "tapped out" her stimulus money after paying the rent and buying furniture. Mother's diminished stimulus funds are concerning given Mother testified she had been unemployed for two and a half years at the time of termination, despite being court-ordered to find and maintain full-time employment. Even more, the termination report created by Zimmerman and Stewart indicated Mother told SFM she was employed on five occasions, yet she never provided proof of employment.

12

Mother testified she was starting a new job the week after the termination hearing, earning $12 per hour, working 36 hours a week. But even so, Mother's testimony is the only evidence suggesting Mother may have stable employment in the foreseeable future. To the contrary, the State's evidence showed that Mother remained unemployed at the time of termination despite a court order for her to find a job. Although she testified that she would start a new job the following week, the State showed that Mother had been dishonest with SFM about her employment in the past. In this respect, it is reasonable for us to look to Mother's past conduct as being indicative of her future behavior. See *In re K.L.B.*, 56 Kan. App. 2d at 447.

The State showed that it was unlikely that Mother's lack of stable housing and stable employment would change in the foreseeable future. Both Zimmerman and Stewart specified these issues as barring reintegration. Zimmerman had concerns for Mother's housing stability because she was not on the lease and her father may have to enter hospice due to an illness. When asked if Mother should be given more time before terminating her rights, Zimmerman answered negatively because she did not believe "stable housing or a stable income will be in the near future." Zimmerman consistently indicated Mother's future unfitness was due to housing, employment, and substance abuse issues. Stewart reiterated Zimmerman's testimony.

And as detailed above, the evidence showed that at the time of removal, Mother was using methamphetamine, was unemployed, and was living with her three children in a hotel. At the time of termination, these issues persisted despite a few clean drug tests, Mother's occupation of a rental, and alleged future employment. Mother has not shown she made long-term changes to the conduct that lead to the removal of her children. See *In re K.L.B.*, 56 Kan. App. 2d at 447.

As another panel of this court noted, "[w]e must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some

final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). At the time for termination, A.H. was six years old and C.P. was two years old, and they had been removed from Mother's care for over one year—roughly half of C.P.'s life. Viewing the evidence in the record in a light most favorable to the State, we find clear and convincing evidence supporting the district court's determination that Mother's unfitness is unlikely to change in the foreseeable future.

*Termination of Mother's Rights Was in the Best Interests of the Children.*

Having found unfitness, the district court must then decide whether termination of parental rights is "in the best interests of the child" K.S.A. 2020 Supp. 38-2269(g)(1). Giving "primary consideration to the physical, mental and emotional health of the child," the district court makes that determination based on a preponderance of the evidence. K.S.A. 2020 Supp. 38-2269(g)(1). *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). The best interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. So an appellate court reviews the best interests decision for an abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

Mother argues the district court abused its discretion in finding termination of her parental rights was in the best interests of the children because the children are young "and had many years of childhood remaining, during which Mother could continue to bond to them and be a significant part of their lives." Mother's brief argument is solely

14

that the district court's best interests finding was unreasonable. But given the testimony presented at trial, Mother's argument is not persuasive.

The State presented evidence that A.H.'s behavior was "parentified" around Mother and her siblings. For example, Zimmerman testified that A.H. tried to calm Mother down when Mother was upset, and she would change C.P.'s diaper and serve food while Mother did not help. Stewart found A.H.'s behavior concerning because A.H. was acting as the parent by recognizing and co-regulating Mother's emotions:

> "Children should be concerned with who they're playing with at recess, who they are going to go see, you know, on weekends or things like that of a child's nature. At six years old, the child should not be concerned with adult responsibilities such [a]s paying rent, where I'm going to live, am I going to be able to eat. That is not the mindset of a typical developing child."

Stewart also testified that A.H. will require a secure environment to grow because she has "experienced multiple adverse childhood experiences" that will impact the rest of her life. Stewart testified A.H. "needs a secure, stable, nurturing environment with adults who can co-regulate with her and who are often regulated themselves . . . . She needs a secure, stable adult."

Stewart later testified that termination was in A.H.'s best interests because A.H.'s attachment to Mother is not healthy and A.H. would continue to be put in a position as parent to Mother and her siblings. Stewart also believed termination was in C.P.'s best interests because Mother has not shown "an appropriate amount of parenting" or "an appropriate amount of long-term systematic change." Zimmerman's testimony was consistent with Stewart's, indicating termination was in the children's best interests because they "need stability, and that's not what they would receive if they were to go home with [Mother] today."

15

The district court gave primary consideration to the physical, mental, and emotional health of the children when it terminated Mother's parental rights, and Mother has not shown the district court's decision was unreasonable. Having reviewed the facts, the law, and the record, we find no abuse of discretion in the district court's decision to terminate Mother's parental rights to A.H. and C.P.

Affirmed.